UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION - AT LONDON

| | |
|---|---|
| **VICTOR GARY HOWARD,**<br>    **Plaintiff,**<br><br>V.<br><br>**CAROLYN W. COLVIN, Acting Commissioner of Social Security,**<br>    **Defendant.** | **CIVIL ACTION NO. 6:14-199-KKC**<br><br><br>**OPINION AND ORDER** |

    This matter is before the Court for consideration of cross-motions for summary judgment. (DE 11 & 12). The Plaintiff, Victor Gary Howard, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial relief from an administrative decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI"). The Court, having reviewed the record, will reverse the Commissioner's decision and remand this matter for further proceedings consistent with this opinion.

## I. OVERVIEW OF THE PROCESS

    In determining whether a claimant has a compensable disability under the Social Security Act, the regulations provide a five-step sequential process which the administrative law judge ("ALJ") must follow. 20 C.F.R. § 404.1520(a)(4); *see also Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 652 (6th Cir. 2009) (describing the administrative process). The five steps, in summary, are as follows:

    1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

    2) If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled.

    3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers*, 582 F.3d at 652 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 404.1520(b)–(g)).

The claimant bears the burden of proof through the first four steps of the analysis; but if the ALJ reaches the fifth step without finding the claimant disabled, then the burden shifts to the Commissioner. *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005). The Commissioner satisfies the burden of proof at the fifth step by finding that the claimant is qualified for—and capable of performing—jobs that are available in the national economy and may rely upon the testimony of a vocational expert ("VE") regarding the range of potential jobs. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423, 425 (6th Cir. 2008).

## II. PROCEDURAL BACKGROUND AND THE ADMINISTRATIVE DECISION

Victor Gary Howard ("Claimant") originally filed a claim for Supplemental Security Income ("SSI") on April 25, 1995. [TR 115]. This claim was approved in October 1995, when Claimant was eleven years old; a favorable determination based in part on a cerebral palsy finding. [TR 115]. When Claimant turned eighteen his benefits came up for redetermination under the adult disability standards. [TR 115]. Following initial and reconsideration denials of his claim, a hearing was held before ALJ Donald Rising, where Claimant testified without representation on October 14, 2004. [TR 115]. The ALJ's February 23, 2005, unfavorable decision was not appealed. [TR 112].

Claimant filed the instant claim for SSI in October 2009, alleging an onset date of October 8, 2009. [TR 9]. The agency denied his application initially and upon reconsideration. [TR 127–28]. Claimant requested review by an ALJ, and a hearing was held on October 19, 2010. [TR 70–109]. ALJ Keith Pilkey issued an unfavorable decision on December 21, 2010. [TR 129–147]. However,

the Appeals Council later reversed that decision and remanded for a new hearing. [TR 148–151]. A final hearing was held on April 23, 2013. [TR 37–69]. The new ALJ, Tommye C. Mangus (hereinafter "ALJ"), issued another unfavorable decision on June 20, 2013. [TR 6–36].

Claimant was 25 years old when his application was filed. [TR 28]. Claimant graduated from High School, but was involved in special education classes. [TR 12] Claimant has no past relevant work. [TR 28]. He alleges disability due to cerebral palsy, a learning disability, and poor vision. [TR 159].

First, the ALJ determined that Claimant has not engaged in substantial gainful activity since his alleged onset date. [TR 12]. Second, the ALJ found that Claimant suffers from the following severe impairments: possible cerebral palsy, borderline intellectual functioning, history of intermittent explosive disorder, and substance abuse. [TR 12]. Third, the ALJ determined that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. [TR 21].

Next, the ALJ reviewed the record to determine Claimant's residual functional capacity ("RFC"). RFC assesses a claimant's maximum remaining capacity to perform work-related activities despite the physical and mental limitations caused by the claimant's disability. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). In finding Claimant's RFC, the ALJ considered the symptoms in light of the objective medical evidence and other relevant evidence, including the following: (i) daily activities; (ii) location, duration, frequency, and intensity of symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication; (v) additional treatment; (vi) additional measures used to relieve symptoms; and (vii) other factors concerning functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529. After reviewing the evidence, the ALJ determined that Claimant has the RFC to perform work that does not require lifting in excess of 20 pounds occasionally or 10 pounds frequently; carrying in excess of

3

10 pounds frequently; sitting in excess of 8 hours per day with no more than 2 hours uninterrupted; standing or walking in excess of 4 hours each during an 8 hour day, with no more than 2 hours uninterrupted; no overhead reaching with the upper extremities; no more than frequent reaching in all other directions, handling fingering, pushing or pulling with the upper extremities; no use of the feet for operation of foot controls; no climbing; no more than occasional balancing, stooping, kneeling, crouching, or crawling; and no more than frequent stooping. The ALJ also found that Claimant can perform jobs requiring simple, repetitive instructions/tasks in an object focused work setting with casual or infrequent public contact and that he has a 5th or 6th grade reading ability. [TR 25].

After establishing Claimant's RFC, the ALJ continued to the fifth step because the Claimant has no past relevant work. [TR 28]. The ALJ asked the VE whether jobs existed in the national economy for a hypothetical individual with Claimant's vocational factors and RFC. The VE noted that this hypothetical individual could perform the requirements for certain representative occupations such as packer, production worker, and inspector/tester, which existed in sufficient numbers in Kentucky. [TR 28]. Therefore, the ALJ found Claimant not disabled. [TR 29].

The ALJ's decision that Claimant is not disabled became the final decision of the Commissioner when the Appeals Commission subsequently denied Claimant's request for review on August 25, 2014. [TR 1–4]. Claimant has exhausted his administrative remedies and filed a timely action in this Court. This case is now ripe for review under 42 U.S.C. § 405(g).

### III. GENERAL STANDARD OF REVIEW

The decision of the Commissioner must be affirmed unless the ALJ applied the incorrect legal standards or the ALJ's findings are not supported by substantial evidence. *Lindsley v. Comm. of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009). "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing the decision of the Commissioner, courts should not conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See Lindsley*, 560 F.3d at 604–05. Courts must look at the record as a whole, and "[t]he court 'may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence.'" *Sias v. Sec. of H.H.S.*, 861 F.2d 475, 479 n.1 (6th Cir. 1988) (alteration in original) (quoting *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)). Rather, courts must affirm the Commissioner's decision so long as it is supported by substantial evidence, even if the court may have decided the case differently. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

## IV. ANALYSIS

On appeal, Claimant presents three issues for review. First, he argues that the ALJ made three separate errors en route to finding that his impairments did not meet or medically equal a listed impairment at step three including: (1) improperly applying the regulations for Listing 12.05C in finding that Claimant did not have a valid IQ score between 60 and 70, despite results of five out of six tests administered containing a facially qualifying score; (2) concluding that all scores in that range were invalid while failing to provide adequate reasons for discounting those results; and (3) incorrectly concluding that Claimant failed to meet cerebral palsy Listing 11.07A or B, instead finding a "possible cerebral palsy" impairment. Second, he asserts that the ALJ erred by selectively altering the recommended physical restrictions propounded by the physician she relied on to fashion the Claimant's RFC. Finally, he contends the ALJ failed to meet her burden at step five because the hypothetical offered to the VE did not adequately represent Claimant's limitations, resulting in testimony that suggested jobs with requirements that the Claimant could not satisfy.

**A. Errors Alleged at Step III**

*1. The ALJ erred in finding that Claimant did not have a valid IQ score between 60 and 70.*

Section 12.05 of the Listings provides the criteria necessary for finding that a claimant's mental impairments qualify for disability as a result of mental retardation:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D).
>
> If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in § § 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

The introductory paragraph requirement, discussed above, is as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The Court will assume for purposes of this discussion that the Claimant can satisfy the diagnostic description in the introductory paragraph. As for the

6

additional mandatory criteria, Claimant principally relies on subsection C, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. at § 12.05C.

Here, the record identifies six separate instances when the Claimant's IQ was tested: in 1995, twice in 1997, in 2003, and in 2012. [TR 118, 421, 732, 802]. The Commissioner relies on precedent providing that remand cannot be based on evidence not before an ALJ for its argument that three of these tests should not be considered by this Court. (DE 19 at 15 n.2). However, the record reveals that ALJ Mangus had ALJ Rising's 2005 decision before her, and that decision discusses the three tests at issue in detail. [TR 30, 118–19]. All of the examinations except the 2009 test resulted in at least one IQ score between 60 and 70. [TR 118, 421, 732, 802]. The ALJ did not address the tests conducted in 1995 or 2003, and she discussed only one of the tests conducted in 1997. This alone casts doubt on her conclusion that Claimant had no valid IQ scores. *See Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir.1985) (observing that "failure to consider the record as a whole undermines" denial of benefits). For each exam she did address, including the 2009 test that did not include a qualifying score, the ALJ found them invalid. [TR 24]. The ALJ and the Commissioner provide several justifications for this decision, each will be discussed below.

Section 12 provides guidance on the role and appropriate use of intelligence tests for analyzing intellectual disabilities. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D(6). The regulations explain that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability" and that "in cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." *Id*. By way of example, in November

7

1997, the Claimant received a verbal IQ of 80, performance IQ of 63, and a full scale IQ of 69—although the ALJ reports that the full scale was 79, the record is to the contrary. [TR 732]. Thus, pursuant to section 12.00, Claimant's relevant qualifying score would be his performance IQ of 63.

Claimant's qualifying scores from 1997 and 2012—and by implication each of his other qualifying scores in 1995, 1997, and 2003—were dismissed by the ALJ as invalid primarily due to what she describes as inconsistency, both from one test to another, and also within the tests themselves. [TR 24]. Initially, this Court would note that this description is exceptionally vague; "inconsistency" provides little guidance in a search for substantial evidence. To the extent that the ALJ suggests that the Claimant's failure to obtain identical scores on each of the administered tests invalidates all of them, such a requirement is entirely too exacting. In so far as "inconsistency" refers to some kind of facially obvious incompatibility between Claimant's scores, such a finding is not supported by substantial evidence. Each test Claimant completed before 2009 was conducted pursuant to instruments that only provided three results: performance, verbal, and full-scale IQ. Claimant's scores on these four tests ranged from 77–80 for verbal IQ[1], from 63–69 for performance IQ[2], and from 70–71[3] for full scale IQ. The level of variation in Claimant's scores from test to test does not provide substantial evidence for invalidating all of the scores.

Expanding on the idea of "inconsistency" both the ALJ and the government allege that internal variation in the scores supports invalidation. [TR 24]; (DE 19 at 12.) The Commissioner cites the American Psychiatric Association's statement that "when there is significant scatter in

---

[1] Inserting the 2009 and 2012 testing pursuant to new methods and the relevant equivalent for verbal IQ only results in an alteration of this range by 1 to 76–80.
[2] The range becomes 63–82 if both 2009 and 2012 testing are added. However, this figure is skewed significantly by the outlier score of 82 from Dr. Pack's 2009 testing, which was modified (DE 11-2 at 8–9). Dr. Pack's 2009 testing is not only an outlier from the standpoint of performance IQ, but also in that it was the only test that did not result in a single qualifying score (note also that Dr. Pack also performed the 2003 test). However, this does not provide substantial evidence for invalidating *all* of the scores as "inconsistent." Omitting the 2009 score results in a performance IQ range of 63–71. If anything, this outlier might provide evidence for the ALJ's decision to ignore the 2009 test itself.
[3] 66–75 including the 2009 and 2012 results.

8

the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's *learning abilities*." Some reliance is also placed on statements by two of the test examiners in their accompanying reports. However, these statements provide neither factual, nor legal support for the resulting invalidations.

The Psychiatric Association's statement describes how variance in performance and verbal results makes full-scale IQ an inaccurate reflection of the person's learning abilities. First, if this statement provides any support for invalidation at all, it would be for only one of the three scores on each of the six tests Claimant underwent—full-scale IQ. Second, neither the psychiatric association statement, nor any of the examiner's statements question the *validity* of the IQ results. In various terms, they each state that score disparity suggests that the results do not necessarily provide an accurate picture of the Claimant's *general* learning ability. [TR 732–33, 802]. General learning ability is to be distinguished from measurements of "verbal reasoning and comprehension", as well as those of "perceptual organization and spatial abilities," which is what Claimant's 1997 examiner, Ms. Kathie Harris, noted Verbal IQ and Performance IQ measure. [TR 732]. The ALJ and the Commissioner both point to Ms. Harris' notation that Claimant's scores on a test measuring "basic academic skills" were "much better than expected." [TR 24, 733]. Ms. Harris also clarifies that this expectation was "in view of his" full scale IQ score, not his verbal or performance IQ scores. [TR 733]. Furthermore, in her initial interpretation of Claimant's scores, Ms. Harris states that the "significant and unusual" disparity between Claimant's verbal and performance IQ scores suggested that "his verbal reasoning is more developed than his perceptual organization abilities," not that these scores were invalid. [TR 732].

Verbal, performance, and full-scale IQs measure different abilities, thus, the fact that certain individuals perform better—even markedly so—in one field than another does not call the validity of the results into question. *See* Social Security Ruling (SSR) 82-54, 1982 WL 31381 at **3,

*retired as obsolete on other grounds* ("In tests containing both verbal and performance sections, an individual may attain a marginally higher score (or in rare instances, even an appreciably higher score) on one component than on the other, but this in no way alters the fact that the severity of impaired intellectual functioning is denoted by the lower of the two scores."). Analogously, a large disparity between a high school student's Math and English scores on the ACT would not support invalidating both scores; they simply test different abilities.

Moreover, the Social Security Administration appears to have realized the significance of each score as an independent measure. It has, thus, directed use of the lowest of the three relevant scores. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D(6). If identity were required between scores, or if only valid full-scale IQ scores were sufficient, the section 12.00 regulation would be superfluous. There is no evidence of malingering on Claimant's part, nor any other indicator that would support invalidating the test results.

Nor does *Daniels v. Comm'r of Social Security*, 70 Fed. Appx. 868 (6th Cir. 2003) support invalidation:

> In *Daniels*, the ALJ did not invalidate IQ test scores and then rely on this fact to find the plaintiff not mentally retarded. Instead, the ALJ in *Daniels* found the plaintiff not to be mentally retarded because, despite valid IQ test scores, there were no findings in the record "that Plaintiff suffered from 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.' " . . . Thus, the ALJ in Daniels found the plaintiff was not mentally retarded because she failed to meet the diagnostic description of mental retardation in the introductory paragraph of Listing § 12.05, not because she failed to have a valid IQ test score.

*Crabtree v. Astrue*, No. 3:10-CV-00458, 2012 WL 260460, at *10 (S.D. Ohio Jan. 30, 2012) report and recommendation adopted, No. 3:10-CV-00458, 2012 WL 529817 (S.D. Ohio Feb. 17, 2012) (internal citations omitted). An ALJ may choose to "disregard I.Q. scores that would normally lead to a finding of disability when those scores were undermined by a doctor's full evaluation." *Dragon*

*v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462 (6th Cir. 2012) (citing *Daniels*, 70 Fed. Appx. at 869, 872). However, the *Dragon* court's decision to disregard IQ scores was not equivalent to a finding of *invalidity*, rather the doctor's full evaluation made those scores *irrelevant* because a claimant must also satisfy "the diagnostic description in the introductory paragraph" to meet a section 12.05 Listing. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. In other words, substantial evidence to support disregarding valid IQ scores is not equivalent to substantial evidence for invalidating those same scores. The evidence relied on by the Commissioner and the ALJ may support finding that Claimant did not have "significantly subaverage general intellectual functioning," but it does not provide substantial evidence for invalidating all of the Claimant's IQ scores. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D(6) ("[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability").

### *2. The ALJ's erroneous invalidation of Claimant's IQ scores was harmless error under § 12.05C.*

Despite the lack of substantial evidence supporting invalidation of Claimant's IQ scores, the ALJ's ultimate decision on Listing 12.05 would not be erroneous if substantial evidence supports a finding that Claimant does not have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22, as required by the Listing's introductory paragraph. *Id.* This step is where statement's such as Dr. Baggs' suggestion that the Claimant's "processing speed subtest . . . should be factored out" resulting in "a better estimate of the claimant's intellectual functioning . . . in the Borderline range[,]" do provide evidentiary support. [TR 802]. The record is replete with such statements and, consequently, this Court finds that the ALJ's invalidation of the Claimant's scores was harmless error for purposes of Listing 12.05. *Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 463 (6th Cir. 2014) (to hold that a qualifying IQ score presumptively satisfies the intellectual functioning requirement would improperly collapse the Listing's first requirement into its third). There is substantial

record evidence that the Claimant did not meet the introductory paragraph requirement of significantly subaverage general intellectual functioning. None of Claimant's examiners diagnosed mental retardation, but rather diagnosed him with borderline intellectual functioning. *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (finding substantial evidence based on borderline intellectual function diagnoses in lieu of retardation diagnoses).

*3. The ALJ's erroneous invalidation of Claimant's IQ scores was not harmless error under § 11.07A.*

Section 11.07 of the Listings provides the criteria for finding a claimant qualifies for disability as a result of cerebral palsy. A claimant must establish the existence of a severe cerebral palsy impairment and any one of the following:

> A. IQ of 70 or less; or
> B. Abnormal behavior patterns, such as destructiveness or emotional instability; or
> C. Significant interference in communication due to speech, hearing, or visual defect; or
> D. Disorganization of motor function as described in 11.04B.

20 C.F.R. pt. 404, subpt. P, app. 1, § 11.07. Thus, the ALJ's invalidation of Claimant's IQ scores was error unless she validly found that Claimant did not have a severe cerebral palsy impairment. 20 C.F.R. § 404.1525(c)(2) ("Even if we do not include specific criteria for establishing a diagnosis or confirming the existence of your impairment, you must still show that you have a severe medically determinable impairment[.]"). Here, the ALJ found that the Claimant had a severe "possible cerebral palsy" impairment. [TR 12]. Thus, although the ALJ doubted the veracity of the diagnosis, she did not doubt the severity of the symptoms as an impairment that "significantly limit[ed] [Claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Such a determination is implicit in her designating the impairment as "severe." The only remaining question is whether the ALJ's finding a "lack of a definitive diagnosis relating to a

neurological disorder/cerebral palsy" is supported by substantial evidence. This Court holds that it is not.

The ALJ's decision first points to a November 7, 2001, assessment by Dr. Saxena. [TR 13]. She characterizes this report as finding "some mild musculo-neural concerns but no gross abnormalities." [TR 13]. In fact, the record reveals that this report is one of many instances in which the Claimant was explicitly diagnosed with cerebral palsy. Dr. Saxena found that Claimant "still is very clumsy and has spasticity of the lower extremities." [TR 509]. The report also described "[i]ncreased muscle tone, especially in the lower extremities and increased deep tendon reflexes of the lower extremities[, abnormal posture] because of spasticity of the lower extremities[, and possible] wasting of the calf muscles because of cerebral palsy." [TR 510]. Dr. Saxena diagnosed spastic diplegia, a form of cerebral palsy. [TR 510].

Furthermore, 2001 Shriner's Hospital records indicate that Dr. Ronald Dubin diagnosed the Claimant with cerebral palsy. [TR 406]. Despite the ALJ's reference to an "unspecified diagnosis" in the Shriner's record, the May 22, 2001, report recommends referral to a neurologist for "complete evaluation." [TR 409]. The ALJ points to a December 24, 2001, note that "indicates that the claimant decided not to return to the hospital for further intervention." [TR 14]. However, the very same notes indicate that on January 21, 2002, Shriner's spoke with the Claimant's mother who indicated her prior unresponsiveness was due to her own hospitalization for heart problems. [TR 402]. They further explain that the recommended neurological evaluation occurred, resulting in a neurologist's diagnosis of "CP" in the notes for January 21, 2002, and a prescription of Ativan. [TR 402]. This diagnosis is confirmed by Dr. Gundavda's examination, which noted "a history of treatment with Ativan for 'mild cerebral palsy'[.]" [TR 14, 522]. Likewise, Dr. Barry Burchett's 2012 examination resulted in his finding "[c]erebral palsy affecting the lower extremities." [TR 786].

13

The only record evidence that could be construed to cast doubt on these diagnoses was that of Joshua Gibson, who performed his examination prior to ALJ's Pilkey's—subsequently remanded—decision. [TR 410–16]. However, Gibson's results are not only inconsistent with virtually every other medical opinion in the record, but also undercut by his status as a resident in Diagnostic Radiology. [TR 353]. This single example of contrary findings, the result of a resident's examination, cannot provide substantial evidence for discrediting the numerous other cerebral palsy diagnoses in the record.

In sum, the ALJ's finding that Claimant had a severe "possible cerebral palsy" impairment, rather than a severe "cerebral palsy" impairment is not supported by substantial evidence. Consequently, the ALJ's erroneous invalidation of all six of the Claimant's IQ scores was not harmless error. This conclusion is further supported by the ALJ's own analysis at step three. In response to Claimant's argument regarding § 11.07, the ALJ limited her response to finding that the Claimant did not meet the requirements of "any *subsection* of listing 11.07." [TR 22 (emphasis added)]. The ALJ did not point to a failure under the introductory "cerebral palsy," requirement, but instead relied on her prior invalidity determination. Because this Court has found the ALJ's invalidation of Claimant's IQ scores—otherwise satisfying Listing 11.07A—unsupported by substantial evidence, remand is necessary for further consideration of Claimant's cerebral palsy impairment at step three.[4]

---

[4] Although this Court's analysis could end here, in the interest of judicial economy the Claimant's remaining contentions will be addressed.

**B. Errors Alleged at Steps IV and V**

*1. Even If the ALJ Properly Discounted Dr. Burchett's Exertional Limitations, No Substantial Evidence Supports the RFC's Exertional Limitations.*

Dr. Burchett completed a physical RFC form after examining Claimant in 2012. The RFC eventually incorporated in the ALJ's final decision adopts Dr. Burchett's recommended limitations with two exceptions. Dr. Burchett recommended limiting the use of Claimant's right arm to no more than occasional reaching in all directions other than overhead, and no more than occasional handling, fingering, pushing or pulling. [TR 63–64]. When a hypothetical individual with all of Dr. Burchett's limitations was offered for the VE's consideration, no jobs were indicated as available in the national economy. [TR 63]. However, both the final RFC and the subsequent hypothetical individual offered to the VE altered the "no more than occasional" restrictions to "frequently." [TR 25. 63].

The ALJ stated that despite giving "some weight to Dr. Burchett's assessment" she did not find "the extensive upper extremity limitations supported[.]" [TR 27]. She found those limitations undercut both by Dr. Burchett's diagnosis of "cerebral palsy affecting the lower extremities" and also by the absence of any supportive clinical finding other than decreased right elbow supination. [TR 27]. Dr. Burchett's report indicated that Claimant had 0 degrees of right elbow supination; however, the ALJ indicated that Claimant exhibited greater than 0 degrees of supination at the hearing. The Commissioner also directs this Court to resident Joshua Gibson's finding of 80 degrees supination in Claimant's right elbow and Plaintiff's admitted activities including: shooting basketball, mowing the yard, using a weed whacker, and performing household chores. (DE 19 at 21). Though this evidence is limited, a reasonable mind could find it supportive of greater than 0 degrees of right elbow supination.

15

On the other hand, whether or not substantial evidence supported the ALJ's discrediting Dr. Burchett's test results, there is no substantial evidence supporting the ultimately adopted RFC. Even if resident Gibson's supination findings, the Claimant's daily activities, and the ALJ's personal observations sufficiently called into question Dr. Burchett's diagnostic results, they do not provide substantial evidence supporting the modified RFC. Gibson never provided a recommendation on limitations and, notably, his examination did reveal deficiencies in right elbow pronation. ALJ's are simply unqualified to "interpret raw medical data in functional terms[,]" and the ALJ's observations[5] alone cannot provide substantial evidence for the eventual RFC. *Nguyen v. Secretary*, 172 F.3d 31, 35 (1st Cir. 1999). Neither the ALJ's opinion, nor the government, point to any medical opinion that supports the limitations adopted in the RFC. Essentially, the ALJ's RFC result appears to have followed a three step process: (1) from her observation of greater than zero degrees supination as contradicting Dr. Burchett's diagnostic results to (2) that observation undercutting Dr. Burchett's recommended functional limitations and finally to (3) that observation *supporting* an alternative recommended functional limitations. This makes too much of a lay observation. *C.f. Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("However, the ALJ must cite some other evidence for denying a claim for pain in addition to personal observation."). If the ALJ was convinced that Dr. Burchett's recommendation was insufficiently supported, she had a responsibility to develop the record further to determine what restrictions the admitted "evidence warranting limitations of the upper extremities" merited. [TR 27]; 20 C.F.R. § 404.1545 ("before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative

---

[5] As previously noted, the Commissioner has highlighted several of the Claimant's daily activities. While these activities provide some additional support for discounting a finding of zero degrees supination, it is a far greater leap to find them supportive of a specific level of limitation. Claimant's testimony does little to describe how exactly he performed these daily activities, i.e., at what pace, frequency, with what restrictions. Thus, inferring an explicit limitation from these would require entirely too much speculation, no different than inferring explicit limitations from observations at a hearing.

examination(s) if necessary"). The ALJ found both that the only limitation offered by the record was contradicted, and that *some* limitation was warranted. [TR 27]. Under the circumstances, an additional examination was necessary to determine *what* limitation was appropriate because no substantial evidence supported any other limitation. In sum, the "more than 0 degrees" of supination exhibited by the Claimant at the hearing may still have supported Dr. Burchett's recommendation, and even if it did not, such an observation did not provide substantial evidence for the RFC's modified limitation. [TR 27]. Consequently, remand is also warranted for further consideration of Claimant's physical RFC.

*2. Substantial Evidence Does Not Support the Hypothetical Offered to the Vocational Expert as an Adequate Portrayal of the Claimant's Limitations.*

Once the fifth step is reached and the burden of proof has shifted to the Commissioner, VE testimony may be used to show that the claimant is capable of performing jobs that are available in the national economy. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423, 425 (6th Cir. 2008). However, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Claimant's final contention, an issue first raised during the hearing, is that the VE's responses could not have satisfied the government's burden at step five because the jobs he offered require a general learning ability above the bottom ten percent of the population. [TR 67–68]; (DE 11-2 at 22.)

Upon this Court's review of the jobs cited by the VE[6], the Dictionary of Occupational titles lists a requirement for each of "General Learning Ability: Level 4 – Lowest 1/3 Excluding Bottom

---

[6] Although the VE only provided one example DOT number, this Court extensively reviewed jobs that might match the other named jobs and found none with a general learning ability requirement below 4.

17

10%." *See e.g.*, Packager, Hand, DICOT 920.587-018; Potato-Chip Sorter, DICOT 526.687-010; Packer, DICOT 920.687-130. At the time of the hearing Claimant was 28 years old. [TR 28]. He has never had a driver's license. [TR 45]. He does not own a cell phone. [TR 59]. His total lifetime earnings are $10.66. [TR 247]. He has been repeatedly diagnosed as having borderline intellectual functioning, a diagnosis the ALJ agreed with by finding that this functioning constituted a severe impairment. [TR 12]. Although all of the testing records are not translated directly to percentile ranks, the overwhelming weight of the evidence—including the ALJ's own borderline intellectual functioning conclusion—support finding his General Learning Ability well within the bottom ten percent nationally. For instance, a 2009 assessment of Claimant's reading ability placed him in the first percentile, and an accompanying test for malingering indicated the Claimant gave his best effort. [TR 422]. As the Claimant's letter to ALJ Pilkey noted, Dr. Pack's finding a full scale IQ of 75—an IQ in the borderline range—corresponds to the sixth percentile nationally. [TR 357]. In short, the record is replete with evidence supporting the Claimant's general learning ability as being at or below the bottom ten percent nationally.

The Commissioner responds that the hypothetical offered to the VE contained all the limitations proposed by Drs. Baggs and Vandivier, the only mental RFC opinions contained in the record. (DE 19 at 21–22.) The Commissioner also admonishes the Claimant for failing to cite to any *medical evidence* that support the mental limitations he proposes. (DE 19 at 21.) The issue at this stage, however, is not whether the RFC is supported by substantial evidence, but whether the VE's testimony satisfied the Commissioner's burden at step five.

"[A]lthough an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with the ALJ's assessment of what the claimant 'can and cannot do.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 644 (6th Cir. 2013) (quoting *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). It is evident that substantial evidence did not support

18

those limitations as an adequate portrayal of Claimant's mental impairments. This is the standard that the Commissioner must satisfy. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). That the hypothetical did not adequately capture the Claimant's remaining capacity to work is obvious in light of the VE's responses. If it had, the VE would not have proposed jobs for Claimant that he was incapable of performing based on his intellectual functioning level.

While it is true that an ALJ need not include limitations that are found incredible; here, the ALJ found that Claimant had a severe borderline intellectual functioning impairment. Each of the jobs proposed by the VE required a general learning ability beyond what a claimant with this impairment could achieve. Thus, the hypothetical was insufficient. *See Sizemore v. Astrue*, No. 09-CV-109-KCC, 2010 WL 3001711, at *10 (E.D. Ky. July 28, 2010) ("the hypothetical posed to the VE did not accurately portray [the claimant's] mental impairments, because her level of intellectual functioning was omitted."); *see also Frazee v. Barnhart*, 259 F. Supp. 2d 1182, 1201 (D. Kan. 2003) (holding under Eighth and Tenth Circuit precedent that an ALJ's failure to include a claimant's borderline IQ as an impairment was error as a matter of law). Consequently, remand is necessary for further consideration of what limitations would adequately account for the Claimant's impaired general learning ability and to determine if work would remain available for such an individual.

## V. CONCLUSION

In sum, substantial evidence did not support the ALJ's invalidation of Claimant's IQ scores. Although that error was harmless for purposes of Listing 12.05, its determinative use in the ALJ's ultimate rejection of the Cerebral Palsy listing was entirely erroneous. Despite substantial evidentiary support for the ALJ's discounting Dr. Burchett's RFC recommendation, no substantial basis was provided to justify the exertional limitations eventually adopted. Finally, the Commissioner's burden at step five was not satisfied by the VE's responses to hypotheticals that did not adequately portray the Claimant's intellectual functioning capacity.

For all these reasons, **IT IS HEREBY ORDERED** that:

1. The plaintiff's motion for summary judgment (DE 11) is **GRANTED** to the extent that the plaintiff requests that this matter be **REMANDED** to the Commissioner;

2. The defendant's motion for summary judgment (DE 19) is **DENIED**;

3. The decision of the Commissioner is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and this matter is **REMANDED** to the Commissioner; and

4. A judgment will be entered contemporaneously with this order.

Dated March 23, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY